**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| **MARK CORTEZ,** § | |
| **PLAINTIFF,** § | |
| § | |
| **v.** § | **CIVIL ACTION NO. 4:10-CV-741-Y** |
| § | |
| **MICHAEL J. ASTRUE,** § | |
| **COMMISSIONER OF SOCIAL SECURITY,** § | |
| **DEFENDANT.** § | |

## FINDINGS, CONCLUSIONS AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE AND NOTICE AND ORDER

This case was referred to the United States Magistrate Judge pursuant to the provisions of Title 28, United States Code, Section 636(b). The Findings, Conclusions and Recommendation of the United States Magistrate Judge are as follows:

## FINDINGS AND CONCLUSIONS

### I. STATEMENT OF THE CASE

Plaintiff Mark Cortez ("Cortez") filed this action pursuant to Section 405(g) of Title 42 of the United States Code for judicial review of a final decision of the Commissioner of Social Security denying his claims for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"). In May 2007, Cortez filed an application for DIB alleging that he became disabled on December 2, 2006.[1] (Transcript ("Tr.") 9, 109-13.) In the Adult Disability & Work History Report he filed with the Social Security Administration in May 2007, Cortez

---

[1] Cortez met the disability insured status requirements under Title II of the Act from his alleged onset date, December 2, 2006, through the date of decision. 42 U.S.C. §§ 416(i)(3) and 423(c)(1).

listed pericardial tamponade and exertional dyspnea under the category of illnesses, injuries and conditions which limited his ability to work. (Tr. 128-29.) His application was denied initially and on reconsideration. (Tr. 9.) The Administrative Law Judge ("ALJ"), J. Frederick Gatzke, held a hearing on October 16, 2008 and issued a decision on December 3, 2008, finding that Cortez was not disabled. (Tr. 6-18, 24-59.) Cortez filed a written request for review, and on August 13, 2010, the Appeals Council denied his request, leaving the ALJ's decision to stand as the final decision of the Commissioner. (Tr. 1-5.)

## II. STANDARD OF REVIEW

Disability insurance is governed by Title II, 42 U.S.C. § 404 *et seq.*, and numerous regulatory provisions govern disability insurance. *See* 20 C.F.R. Pt. 404. The Act defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. §§ 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999).

To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. 20 C.F.R. § 404.1520. First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. § 404.1527. Second, the claimant must have an impairment or combination of impairments that is severe. 20 C.F.R. § 404.1520(c); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000). Third, disability will be found if the impairment or combination of impairments meets or equals an impairment listed in the Listing of Impairments ("Listing"), 20 C.F.R. Pt. 404, Subpt. P, App. 1. 20 C.F.R. § 404.1520(d). Fourth,

2

if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* § 404.1520(e). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's RFC, age, education, and past work experience. *Id.* § 404.1520(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999). At steps one through four, the burden of proof rests upon the claimant to show he is disabled. *Crowley,* 197 F.3d at 198. If the claimant satisfies this responsibility, the burden shifts to the Commissioner to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Id.*

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater,* 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen,* 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if the evidence is present. *Harris v. Apfel,* 209 F.3d 413, 417 (5th Cir. 2000); *Hollis,* 837 F.2d at 1383.

## III. ISSUES

Cortez presents the following issues:

1. Whether the ALJ's residual functioning capacity determination is supported by substantial evidence; and

2. Whether the hypothetical the ALJ presented to the vocational expert is supported by substantial evidence.

(Plaintiff's Brief ("Pl.'s Br.") at 1-2, 3.)


## IV. ADMINISTRATIVE RECORD

### A. ALJ Hearing

At his hearing before the ALJ, Cortez was represented by an attorney, Audrey Ette, and testified on his own behalf. (Tr. 24-48.) An impartial vocational expert ("VE"), Thomas Earnes, and an independent medical expert ("ME"), Dr. Susan Kelly Blue, a neurologist, also testified. (Tr. 24, 26-33, 49-58.) Cortez testified that he had an eleventh-grade education but that he dropped out of school that same year. (Tr. 33, 37.) He told the ALJ that he had not worked since December 24, 2005 because he was unable to work. (*Id.*) Cortez testified that he took several medications, including medication to keep him awake, Topamax for his headaches, blood pressure medication for his heart, and Invega for his hallucinations. (Tr. 34-35.) He told the ALJ that he had only been taking the Invega for three or four months and that his hallucinations were not as bad as they once were. (Tr. 35.) Cortez also told the ALJ that he had pain in his right leg as a result of surgery following an accident, and he rated his pain about a six or seven on a ten-point scale. (Tr. 38.) He told the ALJ that he had problems walking after sitting for

4

more than 10 to 20 minutes because his legs would lock and cause a bad limp. (Tr. 39.) Cortez said that John Peter Smith Hospital ("JPS") had given him a cane, which he used when he walked around the mall or Wal-Mart. (*Id.*) He further testified that he was unable to squat. (Tr. 40.) Cortez also acknowledged that while he used to have problems taking care of personal needs such as bathing or dressing, he was no longer challenged in that way and only got dizzy if he bent over. (*Id.*)

The ME testified based on her analysis of the records from Cortez's treating physicians. (Tr. 27-33.) She told the ALJ that the record did not establish diagnoses of narcolepsy or seizure disorder. (Tr. 27.) The ME also opined that she did not think that there was "ongoing substantiation of psychiatric problem," and that Cortez did not have a mood disorder severe enough to keep him from working. (Tr. 32.)

After hearing the testimony of both Cortez and the ME, the ALJ posed the following hypothetical question to the VE:

> Now, if the claimant were limited to work at the light exertional level, which permitted an intermittent opportunity to alternate between sitting and standing, did not require collaboration with co-workers, did not require work at heights, around dangerous moving machinery…did not require the operation of commercial vehicle…did not involve prolonged walking and was performing instructions at the low end of the detailed work instructions, well into semi-skilled, in other words…would there be any of his prior work he'd be able to perform?

(Tr. 50-51.) The VE responded that the claimant could not perform any of Cortez's past relevant work. (Tr. 51.)

The ALJ then asked the VE if there were other jobs that exist in the national economy that a hypothetical individual the same age as Cortez, with the same education and work

experience, could perform. (*Id.*) The VE responded that there were such jobs. (*Id.*) Specifically, the VE identified the job of photocopy machine operator, a light, unskilled job with 900 jobs in the state of Texas and 12,800 jobs nationally. (*Id.*) He then identified the job of counter clerk, a light, unskilled job with 1,500 jobs in Texas and 18,500 jobs nationally. (*Id.*) Finally, he identified the job of air purifier servicer, a light, unskilled job, with 1,500 jobs in Texas and 18,000 jobs nationally. (*Id.*)

## B. The ALJ's Decision

In making his decision, the ALJ performed the familiar five-step sequential evaluation process for determining whether a person is disabled. (Tr. 10.) At step one, the ALJ found that Cortez met the disability insured status requirements under Title II of the Act from Cortez's alleged onset date, December 2, 2006, through the date of the ALJ's decision. (Tr. 17.) He also found that Cortez had not engaged in substantial gainful activity from December 2, 2006 through the date of the ALJ's decision.[2] (*Id.*, citing 20 C.F.R. § 404.1571.)

At step two, the ALJ found that Cortez had a "severe" combination of impairments. (Tr. 17); 20 C.F.R. 404.1520(c); *Stone*, 752 F.2d 1099; *Bowen v. Yuckert*, 482 U.S. 137 (1987); Social Security Regulation ("SSR") 96-3p. After evaluating all of the evidence in the record, the ALJ identified Cortez's severe impairments as: (1) status-post mitral valve replacement, with resolved cardiac tamponade and residual left phrenic nerve paresis; (2) status-post fractured right femur and calcaneus, both status-post open reduction and internal fixation, with a dislocated right elbow, and residual degenerative changes; (3) cataplexy of undetermined etiology, with

---

[2] There were references of recent work activity in Cortez's medical records, and subsequent wages had been posted to the earnings record. (Tr. 11.) The ALJ considered the wages minimal, however, and presumed that Cortez had not engaged in substantial gainful activity since December 2, 2006. (Tr. 17.)

ruled-out narcolepsy and epilepsy; (4) history of migraine headaches; (5) controlled hypertension; (6) a mood disorder; and (7) a history of attention deficit disorder. (Tr. 17.)

The ALJ then found that Cortez did not have an impairment or combination of impairments that met or equaled a listing at step three of the disability analysis. (*Id.*); 20 C.F.R. § 404.1525-404.1526. The ALJ determined that Cortez's subjective complaints were reasonably related to his medically determinable impairments, but he also found that Cortez's testimony and other statements concerning his subjective complaints and functional limitations were not credible or reasonably supported by the objective medical evidence. (*Id.*)

The ALJ next formulated Cortez's RFC. The ALJ determined that Cortez retained the exertional capacity for the sustained performance of a modified range of light work activities, [3] with an intermittent sit-stand option, [4] that he could not work at heights or near dangerous moving machinery, that he could not do commercial driving, and that he could not walk for long periods of time (i.e. periods longer than 45 minutes to an hour). (*Id.*) He also found that Cortez had mental limitations and limited him to jobs that would not require Cortez to work in collaboration

---

[3] A full range of light work activity involves the lifting of no more than twenty pounds at a time with the frequent lifting of up to ten pounds, and standing and walking, off and on, for a total of six hours out of an eight-hour workday. 20 CFR 404.1567; 20 C.F.R. § 404.1567(b); 20 C.F.R. § 416.967(b); SSR 83-10, 1983 WL 31251, at *5 (S.S.A. 1983). Additionally, "a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." SSR 83-10, 1983 WL 31251, at *5 (S.S.A. 1983).

[4] The medical facts may lead to an assessment of RFC compatible with the performance of either light or sedentary work except that a person must alternate periods of sitting and standing. The individual may be able to sit for some time, but must then stand or walk for a time before sitting again. Such an individual is not functionally capable of prolonged sitting as defined for sedentary work (and for the few light jobs performed primarily in a seated position) or the prolonged walking or standing at SSR 83-12, 1983 WL 31253, at *4 (S.S.A. 1983). Persons who can adjust to vary sitting and standing by doing so at lunch periods, breaks, etc., are still able to perform a defined range of work. *Id.*

with coworkers, *i.e.* no teamwork, and to jobs where he would only receive job instructions at the lower end of the detailed level, *i.e.* jobs at the lower end of the semi-skilled level. (Tr. 17-18.)

At step four, the ALJ determined that Cortez was unable to perform his past relevant work as an equipment servicer or concrete finisher. (Tr. 18.) Then at step five, the ALJ determined that, given Cortez's age, education, work experience, and RFC, there were jobs existing in significant numbers in the national economy that Cortez could perform. (Tr. 18, citing 20 C.F.R. § 404.1569 and 404.1569a.) The ALJ specifically listed the jobs the VE had previously identified, including photocopy machine operator, counter clerk, and air purifier servicer. (Tr. 18.) Ultimately, the ALJ concluded that Cortez was not under a disability within the meaning of the Act at any time from his alleged date of onset, December 2, 2006, through the date of the ALJ's decision. (Tr. 17-18.)

## V. DISCUSSION

### A. Whether the ALJ's RFC determination is supported by substantial evidence.

Cortez alleges that the ALJ's RFC determination is not supported by substantial evidence for three reasons. (Pl.'s Br. at 1-2.) First, Cortez claims that the ALJ failed to consider the entire record in formulating Cortez's RFC, specifically including evidence submitted after the hearing before the ALJ. (*Id.*) Second, Cortez claims that the ALJ did not give proper weight to the reports and opinions of the treating physicians regarding his physical and mental impairments. (*Id.*) Third, Cortez claims that the ALJ failed to consider all of his mental impairments, as well as his narcolepsy and cataplexy, and their resulting impact on Cortez's RFC. (*Id.*)

## 1. **Whether the ALJ failed to consider the entire record.**

Cortez first contends that the ALJ's decision is not based on substantial evidence because he did not consider the entire record in finding that Cortez was not disabled. After his hearing before the ALJ, but before the ALJ rendered his decision, Cortez submitted evidence from his treating psychiatrist, Dr. Maryrita K. Mallet, M.D. ("Mallet"). (Pl.'s Br. at 1-2; Tr. 501-12.) According to Cortez, that evidence was improperly disregarded by the ALJ as contrary to both the testimony of the ME and the opinion of the state agency physician. (*Id.* at 2.) Cortez argues that if the ME and the state agency physician had been afforded the opportunity to review Mallet's medical records submitted after the hearing, the evidence would have changed their opinions. (*Id.*) Thus, Cortez argues, the ALJ's ultimate determination that Cortez was not disabled was not supported by substantial evidence. (*Id.*) The Court disagrees.

The evidence in question contained: (1) a list of medications Cortez had been prescribed by Mallet; (2) a mental impairment questionnaire completed by Cortez regarding his own assessment of various symptoms he experienced; and (3) a psychiatric assessment form completed by Mallet. (Tr. 501-12.) In the multiple choice questionnaire Cortez filled out, he was asked to choose a number from "0" (the least severe) to "3" (the most severe) describing the severity of his symptoms over the past week. (Tr. 502-04.) On 19 of the 21 symptoms, Cortez indicated that his symptoms were best described as a "0" or a "1". (*Id.*) The question he answered with a "2" stated "I get tired from doing almost anything," and the question he answered with a "3" stated "I crave food all the time." (Tr. 504.)

In the psychiatric assessment form Mallet completed, she observed that Cortez's appearance, dress, grooming, and speech were all "OK." (Tr. 505.) She also indicated that

Cortez showed no psychomotor slowing or agitation, exhibited no anxiety at the time, had goal-directed thought processes, possessed fair judgment, fair insight and average intelligence. (Tr. 505-06.) She also indicated that Cortez reported experiencing hallucinations. (Tr. 505.)

In assessing Cortez's functional capacities, Mallet indicated that Cortez was unable to: (1) understand, remember, and carryout instructions; (2) respond appropriately to supervision; or (3) supervise or manage others. (Tr. 506-07.) Under the vocational portion of the assessment, Mallet noted that Cortez wanted to go back to work, but she said that the treatment plan was not addressing a return to work because Cortez was unable to do anything but very basic activities of daily living. (Tr. 509.)

The ALJ was able to review this evidence before making his determination, specifically admitting it into the record and acknowledging it in his decision. (Tr. 9, 14-15, 473-93, 501-36.) He also noted that Cortez had no history of psychiatric in-patient care, supervised or assisted living services, or frequent, intensive out-patient counseling, nor had he been the subject of court-ordered mental health proceedings. (Tr. 15.) He reviewed the entire medical record, specifically mentioning the lack of objective data supporting Mallet's conclusions and noting the inconsistencies in Cortez's medical records. (Tr. 13-15.) The ALJ also commented that with the one exception of pushing his wife, Cortez had "no recent history of bizarre, aberrant, or harmful behavior and he has no gross emotional irregularities or cognitive limitations." (Tr. 15.)

An ALJ may properly reject all or portions of a physician's opinion when the overall evidence supports a contrary conclusion. *Martinez v. Chater*, 64. F.3d 172, 176 (5th Cir. 1995). Moreover, the ultimate decision as to disability rests solely with the ALJ. *See* 20 CFR § 404.1527(f); *McDonald v. Astrue*, No. 1:08–CV–185–BI, 2010 WL 1076140, at *6 (N.D. Tex.

Mar. 23, 2010). The Court finds that the ALJ properly considered the entire record, including Mallet's records submitted after the hearing.

Cortez also submitted additional evidence to the Appeals Council with his request for review of the ALJ's decision, and the Appeals Council denied his request. (Pl.'s Br. at 2-3, 12, 16.) Social Security regulations allow claimants to submit new and material evidence to the Appeals Council when requesting a review of an ALJ's decision to deny benefits. 20 C.F.R. §§ 404.970(b), 404.976(b); *see also Rodriguez v. Barnhart,* 252 F.Supp.2d 329, 332 (N.D. Tex. 2003). The Appeals Council is required to evaluate the entire record, including any new and material evidence submitted by the claimant. *Id.* New and material evidence must relate to the time period for which benefits were denied and/or must not be merely cumulative of other evidence. *Johnson v. Heckler,* 767 F.2d 180, 183 (5th Cir. 1985); *see also Latham v. Shalala,* 36 F.3d 482, 483 (5th Cir. 1994). The Appeals Council's decision to decline to grant review of an ALJ's decision is part of the "final decision" and, as such, is reviewable in federal court. *See Higginbotham v. Barnhart,* 405 F.3d 332, 337–38 (5th Cir. 2005).

In the Fifth Circuit, "evidence submitted by a claimant to the Appeals Council does not per se require remand to the Commissioner simply because the Appeals Council failed to address the evidence in its decision." *McGee v. Astrue,* No. 08–0831, 2009 WL 2841113, at *6 (W.D. La. Aug.28, 2009) (citing *Higginbotham,* 405 F.3d at 332 and *Higginbotham v. Barnhart,* 163 F. App'x 279, 281–82 (5th Cir. 2006) (*"Higginbotham II"* ))). "A court considering the final decision should review the record as a whole, including the new evidence, to determine whether the Commissioner's findings are supported by substantial evidence, and should remand only if the new evidence dilutes the record to such an extent that the ALJ's decision becomes

11

insufficiently supported." *Lee v. Astrue,* No. 3:10–CV–155–BH, 2010 WL 3001904, at *7 (N.D. Tex. July 31, 2010) (citing *Higginbotham II,* 163 F. App'x at 281–82). Moreover, the Appeals Council is bound to follow the same rules for considering medical opinion evidence as the rules that bind ALJs. 20 C.F.R. § 404.1527(f)(3). The Act specifically provides that all medical opinions are to be considered in determining the disability status of a claimant. 20 C.F.R. § 404.1527(b).

In the present case, the ALJ held that Cortez was not disabled on December 3, 2008. (Tr. 6-18, 24-25.) On December 10, 2008, Cortez filed a written request for review. (Tr. 20.) On June 2, 2010, Cortez submitted new medical evidence from Mallet, Cortez's psychiatrist, and Dr. Robert P. Odgers, M.D. ("Odgers"), Cortez's neuropsychologist. (Pl.'s Br. at 2, 16); (Tr. 159-161, 538, 540-43, 547-56, 558-69.) The Appeals Council denied Cortez's request for review on August 13, 2010. (Tr. 1-5.) The Appeals Council acknowledged receipt of the new evidence, expressly stating, "we considered the reasons you disagree with the decision and the additional evidence listed on the enclosed Order of Appeals Council."[5] (Tr. 1-5.) Moreover, the Appeals Council found the evidence to be "mostly duplicative." (Tr. 4, 5, 540-43, 547-56, 558-69.) Mallet generally reiterates her previously submitted reports regarding Cortez's moods, medications, and symptoms. (Tr. 473-93, 501-36, 540-43, 547-56.) And the evidence submitted by Odgers, is likewise duplicative of previous findings regarding Cortez's moods, medications, and symptoms. (Tr. 473-93, 501-36, 558-69.) Evidence which is merely cumulative of other evidence is not material. *See e.g., Latham,* 36 F.3d at 483. The Fifth Circuit has made it clear

---

[5] Additional evidence listed on the Order of Appeals Council referenced treatment notes from Mallet and Odgers. (Tr. 4-5.)

that a detailed discussion by the Appeals Council of additional evidence pursuant to the factors set forth in 20 C.F.R. § 404.1527(d) is not required. *Higginbotham*, 405. F.3d at 335 n.1. The Court finds no error in the decision of the Appeals Council denying Cortez's request for review.

**2. Whether the ALJ properly evaluated the treating physicians' opinions.**

Cortez next claims that the ALJ almost exclusively relied on the opinions of the ME and the state agency physician, rather than giving the opinions of Cortez's treating physicians considerable, if not controlling, weight. (Pl.'s Br. at 16.) In *Newton v. Apfel*, the Fifth Circuit Court of Appeals held that "absent reliable medical evidence from a treating or examining specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)." *Newton*, 209 F.3d 448, 453 (5th Cir. 2000) (emphasis in original). Under the statutory analysis of 20 C.F.R. § 404.1527(d), the ALJ must evaluate the following: (1) examining relationship, (2) treatment relationship, including the length, nature and extent of the treatment relationship, as well as the frequency of the examination(s), (3) supportability, (4) consistency, (5) specialization, and (6) other factors which "tend to support or contradict the opinion." 20 C.F.R. § 404.1527(d); *see also* 20 C.F.R. § 416.927(d); Social Security Ruling ("SSR") 96-6p, 1996 WL 374180, at *3 (S.S.A. July 2, 1996); SSR 96-2p, 1996 WL 374188, at *4 (S.S.A. July 2, 1996).

Pursuant to *Newton*, the ALJ is required to perform a detailed analysis of the treating physician's views under the factors set forth in 20 C.F.R. § 404.1527(d) *only* if there is no other reliable medical evidence from another *treating or examining* physician that *controverts* the treating specialist. *See Newton*, 209 F.3d at 455-57. But the Court's decision in *Newton* "is

13

limited to circumstances where the administrative law judge summarily rejects the opinions of a claimant's treating physician, based only on the testimony of a non-specialty medical expert who had not examined the claimant." *Contreras v. Massanari*, No. 1.00-CV-242-C, 2001 WL 520815, at *4 (N.D. Tex. May 14, 2001). The ALJ in the instant case, however, thoroughly examined the opinions of Cortez's treating physicians. The ALJ's decision makes clear that while the testimony of both the ME and state agency physician was considered, the ALJ declined to give controlling weight to the opinions of Mallet, Cortez's treating psychiatrist, and Dr. Jon Walker ("Walker"), Cortez's primary care physician, due to a lack of corroboration from the objective data and due to inconsistencies between Cortez's medical records and in Cortez's subjective testimony. (Tr. 12-15.)

In determining Cortez's RFC, the ALJ considered opinions from all of Cortez's treating physicians, including Doctors Paul M. Myers ("Myers"), Robert S. Meidell ("Meidell"), Richard M. Vigness ("Vigness"), Jeffry Lin ("Lin"), Henry Raroque, Jr. ("Raroque"), and Lynn Wang ("Wang"), as well as Mallet and Walker. (Tr. 10-15.) He also considered the opinions of the ME and the state agency physician. (*Id.*) After a thorough review of all of the evidence, the ALJ ultimately concluded that portions of the opinions of three of Cortez's treating physicians, Walker, Wang, and Mallet, were not well-supported by detailed, clinical diagnostic evidence and were otherwise unsupported by the evidence. (*Id.*) He also noted inconsistencies between those treating physicians' records and Cortez's subjective complaints. (*Id.*); SSR 96-2p, 1996 WL 374188, at *2-3 (S.S.A. July 2, 1996). An ALJ can decrease the weight assigned to a treating physician's opinion for good cause, which includes disregarding statements that are brief and conclusory, unsupported by acceptable diagnostic techniques, or otherwise unsupported by the

14

evidence. *Leggett*, 67 F.3d at 566; *Greenspan*, 38 F.3d at 237 (5th Cir. 1994); *see also* 20 C.F.R. §§ 404.1527(e), 416.927(e). The ALJ's decision reflects that he extensively evaluated the medical evidence in the record to determine Cortez's physical and mental impairments. (*See* Tr. 12-14.) The ALJ expressly stated that he considered the following factors: (1) Cortez's daily activities; (2) the location, duration, frequency, and intensity of Cortez's subjective complaints; (3) any precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of medication; (5) the prescribed treatment regimen; and (6) any other palliative measures Cortez may have used. (Tr. 12.)

In reviewing medical evidence pertaining to Cortez's alleged physical impairments for the RFC determination, the ALJ carefully considered the treating physicians' opinions, but found that much of the evidence was inconsistent and lacked corroboration from supporting data. (Tr. 401-29, 431-67, 469-70, 495-98, 501-36.) First, Walker's notes indicated that Cortez's orthopedic and cardiac impairments had been stable since December of 2006 and February of 2007, respectively. (Tr. 431-40, 495-98.) Walker later completed a functional capacity assessment and recommended that Cortez avoid workplace hazards but did not specify Cortez's physical abilities. (Tr. 401-09.) Wang noted on October 23, 2006, that Cortez was well-oriented, did not have acute distress, had normal sensory and reflex systems, had intact coordination, had no cranial nerve system abnormalities, had regular gait, and had no signs of other symptoms indicating etiology. (*Id.*) Wang further noted that ordering the diagnostic MRI of the brain was based on Cortez's cardiac history. (*Id.*) Finally, although Walker and Wang submitted forms for private disability carriers, neither doctor completed the forms, referred to a particular diagnostic test performed, nor quantified Cortez's functional capacities. (Tr. 501-36.)

15

As for Cortez's alleged narcolepsy, Wang diagnosed Cortez with *questionable narcolepsy*. (Tr. 441-70, 501-36.) Another neurologist, Raroque, found that Cortez's MRA of his head did not satisfy criteria required for narcolepsy. (Tr. 410-29.) And the ME, also a neurologist, reviewed Cortez's medical records and determined that seizures and narcolepsy had been ruled out based on the various tests and procedures in the medical evidence. (Tr. 27-29.) She noted that: (1) Cortez's treating physicians frequently observed Cortez's alert and normal mental status; (2) the advice given to Cortez by his physicians to avoid driving or hazards was routine advice given to patients complaining of seizures; and (3) Cortez had unremarkable exams. (Tr. 27-29.) Thus, the inconsistencies among the treating physicians' opinions regarding physical impairments and the lack of corroboration from supporting data both served as bases for the ALJ to decrease the weight of the opinions. *Leggett*, 67 F.3d at 566; *Greenspan*, 38 F.3d at 237; *see also* 20 C.F.R. §§ 404.1527(e), 416.927(e).

The ALJ also found that the treating physicians' opinions regarding Cortez's physical impairments were inconsistent with Cortez's subjective complaints. (Tr. 17.) Cortez testified at his hearing before the ALJ that his dizzy spells occurred once a month but resolved fifteen minutes after he laid down. (Tr. 151-56.) He claimed he had residual pain in his right leg and arm, but he acknowledged that he took only over-the-counter pain medication rather than prescription pain medication. (*Id.*) Cortez testified that he took Topamax for headaches in addition to heart medications and suffered no adverse side effects. (Tr. 140-48, 151-56.) The Fifth Circuit has repeatedly held a condition that can be controlled by medication cannot be a basis for finding disability. *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988).

16

Because of the foregoing inconsistencies, the ALJ gave more weight to the opinions of the ME and the state agency physician, whose opinions concurred with the opinions of Myers, Meidell, Vigness, and Lin that Cortez had medically determinable severe impairments capable of producing his subjective complaints. (Tr. 27-32, 149, 158, 401-408, 409, 355-400.) The ME and the state agency physician also appeared to concur with Raroque's determination that narcolepsy had not been established. (Tr. 27-32, 149, 158, 401-408, 409, 410-29.) And though the state agency physician acknowledged the severity of Cortez's underlying impairments, he also suggested that Cortez could perform light base-level work activities with precautions against workplace hazards. (Tr. 401-09.)

The ALJ likewise extensively evaluated the medical evidence in the record to determine Cortez's mental impairments for the RFC determination, including evidence from treating physicians, Mallet and Wang. (Tr. 14-15, 149, 158, 473-93, 501-36.) On October 24, 2007, Mallet observed that Cortez had normal thought and speech content. (Tr. 473-93.) She assessed Cortez with a global assessment of functioning ("GAF")[6] score of 60, indicating moderate limitations. (*Id.*); DSM-IV at 34. On February 13, 2008, Mallet increased Cortez's GAF score to 65,[7] indicating Cortez's functioning had improved. (Tr. 501-36); DSM-IV-TR at 34.

On September 9, 2008, Mallet again noted that Cortez was alert with good eye contact and that Cortez denied adverse side effects from medication. (Tr. 493) Mallet assessed Cortez's

---

[6] A Global Assessment of Functioning or GAF score is a standard measurement of an individual's overall functioning level with respect to psychological, social, and occupational functioning. American Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 34 (4TH ed. 2000) ("DSM-IV"). A GAF score of 51 to 60 reflects some moderate symptoms such as a flat affect, circumstantial speech, and occasional panic attacks or moderate difficulty in social, occupational, or school functioning. (*Id.*)

[7] A GAF score of 61 to 70 reflects some mild symptoms such as a depressed mood or mild insomnia or some difficulty in social, occupational, or school functioning. DSM-IV at 34.

17

GAF at 63. (*Id.*); DSM-IV-TR at 34. On October 29, 2008, Mallet completed a work capacity mental evaluation form in which she indicated that Cortez had a number of limitations. (Tr. 524-26.)

The ALJ noted that Mallet's records showed that Cortez had no history of psychiatric in-patient care, had never been placed in supervised or assisted living centers, had never been a frequent patient of intensive out-patient counseling, and had never been the subject of a court-ordered mental health proceeding. (Tr. 15.) The ALJ also considered the opinions of the state agency physician that Cortez did not have a potentially severe mental impairment. (Tr. 149.) And the ALJ considered the ME's testimony that nothing in the record established a psychotic disorder or mental impairment which could prevent Cortez from working. (Tr. 32.) Finally, the ALJ considered the discrepancy between Cortez's subjective testimony and the medical records. For example, Cortez acknowledged that his prescribed anti-psychotic medication, Geodon, "really helped" after his dosage was adjusted from 80 mg to 60 mg a day. (Tr. 481.) He also said that the Topamax had helped his migraine headaches that that his medication was helping his temper. (Tr. 14, 410, 487-88, 492.)

Moreover, although the ALJ was not required to give a detailed analysis of the *Newton* factors, he nevertheless implicitly acknowledged each factor in his decision. (Tr. 10-15); *see Newton*, 209 F.3d at 455-57. As to factors one and two, it is apparent that the ALJ was aware of the examining and treatment relationships between Cortez and his treating physicians. In his decision, he specifically referenced "treating physicians" and also referenced various tests, procedures, and medications administered. (Tr. 13-15.) As to factors three, four, and six, the ALJ indicated that he rejected parts of the treating physicians' opinions as to disability because

he did not find such opinions were supported by the evidence. For instance, neither Walker nor Wang completed the forms given to the private disability carrier nor did they attempt to quantify Cortez's actual functional capacities or refer to any particular diagnostic test or clinical observation. (Tr. 501-36.) The ALJ also referenced Mallet's questionnaires. (Tr. 14-15.) As to factor five, the ALJ recognized that Walker was Cortez's primary care physician, Wang was his neurologist, and Mallet was his psychiatrist. (Tr. 10, 12, 14.) The Court finds that the ALJ properly considered the relevant medical opinions. *Leggett*, 67 F.3d at 566; *Greenspan*, 38 F.3d at 237; *see also* 20 C.F.R. §§ 404.1527(e), 416.927(e).

### 3.  <u>Whether the ALJ properly included all of Cortez's limitations in the RFC.</u>

Finally, Cortez argues that the ALJ's RFC determination is not supported by substantial evidence because the ALJ failed to properly consider Cortez's mental impairments, as well as his alleged narcolepsy and cataplexy, and their resulting limitations. (Pl.'s Br. at 2.) RFC is what an individual can still do despite his limitations. SSR 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996). This determination reflects the individual's maximum remaining ability to do sustained work activity in an ordinary work setting on a regular and continuing basis. *Id*; *see also Myers v. Apfel*, 23 8F.3d 617, 620 (5th Cir. 2001). A regular and continuing basis is an eight-hour day, five days a week, or an equivalent schedule. *Id.* RFC is not the least an individual can do, but the most. SSR 96-8p, 1996 WL 374184, at *2. The RFC assessment is a function-by-function assessment, with both exertional and nonexertional factors to be considered, and is based upon all of the relevant evidence in the case record. *Id.* at *3-5. The responsibility for determining a claimant's RFC lies with the ALJ. *See Villa v. Sullivan*, 895 F.2d 1019, 1023 (5th Cir. 1990).

The ALJ will discuss the claimant's ability to perform sustained work activity on a regular and continuing basis and will resolve any inconsistencies in the evidence. SSR 96-8p, 1996 WL 374184, at *7.

In making an RFC assessment, the ALJ must consider all of the claimant's symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, and must further consider limitations and restrictions imposed by all of an individual's impairments, even impairments that are not severe. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *1 (S.S.A. July 2, 1996); SSR 96-8p, 1996 WL 374184, at *5. The RFC assessment is based upon "all of the relevant evidence in the case record," including, but not limited to, medical history, medical signs and laboratory findings, the effects of treatment, reports of daily activities, lay evidence, recorded observations, medical source statements, and work evaluations. SSR 96-8p, 1996 WL 374184, at *5 (emphasis in original). The ALJ is permitted to draw reasonable inferences from the evidence in making a decision, but the social security rulings also caution that presumptions, speculation, and supposition do not constitute evidence. *See, e.g.*, SSR 86-8, 1986 WL 68636, at *8 (S.S.A. 1986), superseded by SSR 91-7c, 1991 WL 231791, at *1 (S.S.A. Aug. 1, 1991) (only to the extent the SSR discusses the former procedures used to determine disability in children).

In the present case, the ALJ recognized Cortez's mental limitations by limiting him to receiving job instructions at the lower end of the detail level and by limiting him to jobs that do not require Cortez to work in collaboration with others. (Tr. 15, 17-18.) The ALJ recognized Cortez's physical limitations by limiting him to relatively less strenuous light work, requiring a sit-stand option, and ruling out jobs that require working at heights or near dangerous, moving

20

machinery, commercial driving, or working for prolonged periods. (Tr. 14, 17.) In formulating Cortez's RFC, the ALJ considered all of the evidence in the record, including Cortez's subjective complaints which the ALJ found to be supported and consistent with objective medical evidence in the record. (Tr. 11, 14, 15, 17, 33-49); SSR 96-8p, 1996 WL 374184, at *5 (S.S.A. July 2, 1996). The ALJ clearly considered Cortez's medical history, as evidenced by his detailed chronology of relevant procedures and by the ALJ's discussion of the opinions of Cortez's treating physicians. (Tr. 10-15.) The ALJ also considered the effectiveness of Cortez's treatment. (Tr. 14, 472-93.) For example, Cortez testified that taking Topamax for headaches gave him no adverse side effects, that Depakote, an anti-convulsant, made him drowsy, and that the anti-psychotic Geodon was "somewhat effective." (Tr. 140-48, 151-56, 473-93.)

First, Cortez argues that the ALJ failed to incorporate Mallet's and Odgers' diagnoses of attention deficit disorder and other concentration deficits, which impacted his ability to work. (Pl.'s Br. at 16.) As previously discussed, however, Mallet's and Odgers' opinions were not given considerable weight because they were unsupported by and inconsistent with the evidence in the record. 20 CFR § 404.1527(d)(2). Moreover, Mallet and Odgers noted that Cortez was fully oriented and that he independently performed activities of daily living. (Tr. 560-67.) The Court finds that the ALJ properly incorporated Cortez's mental limitations related to concentration deficits into the RFC determination by limiting him to jobs where he could receive job instructions at the lower end of the detail level without working in collaboration with others. (Tr. 15, 17-18.)

Second, Cortez argues that the ALJ failed to incorporate Odgers' diagnosis of Borderline Intellectual Functioning, which impacted his ability to work. (Pl.'s Br. at 16.) Odgers' records

21

specify that Cortez functioned best at tasks requiring basic repetitive motor skills. (Tr. 115, 558-69.) This work-related mental limitation is likewise consistent with the ALJ's RFC determination that Cortez was limited to jobs where he could receive job instructions at the lower end of the detail level without working in collaboration with others. (Tr. 15, 17-18.)

Third, Cortez claims that the ALJ failed to incorporate Cortez's difficulty in handling stress, scheduling, coworkers, and supervisors, as acknowledged by Mallet, which impacted his ability to work. (Pl.'s Br. at 16.) The ALJ did, however, take this limitation into consideration by limiting Cortez to jobs where he could receive job instructions at the lower end of the detail level without working in collaboration with others. (Tr. 15, 17-18.)

Finally, Cortez argues that the ALJ failed to incorporate Cortez's unconscious spells, which impacted his ability to work. (Pl.'s Br. at 17.) The ALJ noted that although Walker opined that narcolepsy and cataplexy interfered with all of Cortez's activities, Raroque opined that the spells were non-epileptic in nature and that a firm diagnosis could not be reached. (Tr. 13, 410, 412, 420-21.) Wang's testing also ruled out a narcolepsy diagnosis. (Tr. 13, 447, 452, 461.) Thus, the Court finds the ALJ did not commit legal error in deciding not to incorporate limitations related to narcolepsy and cataplexy into the RFC determination.

The Court finds that the ALJ considered the entire record and appropriately considered the relevant medical opinions and incorporated Cortez's limitations into his RFC determination.

**B. Whether the ALJ properly presented the hypothetical question to the VE.**

Finally, Cortez claims that the hypothetical question the ALJ presented to the VE at the hearing, which served as a basis in the ALJ's ultimate decision as to disability, was defective

because it did not contain all limitations Cortez had established and thus the ALJ's opinion is not supported by substantial evidence. (Pl.'s Br. at 17-18.)

A VE is called to testify because of his familiarity with job requirements and working conditions. *Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995) (citing *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)). The ALJ is not required to incorporate limitations into the hypothetical question presented to the VE that he did not find to be supported in the record. *See Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir. 1988). The hypothetical presented to the VE must reasonably incorporate all disabilities recognized by the ALJ's RFC assessment, and the claimant or his representative must be afforded the opportunity to correct any deficiencies in the ALJ's question. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994). Therefore, if the ALJ's hypothetical question fails to incorporate all such functional limitations, the ALJ's determination is not supported by substantial evidence. *Id.*

In the instant case, the ALJ recognized Cortez's physical limitations by limiting him to light work, requiring a sit-stand option, and ruling out jobs that require working at heights or near dangerous, moving machinery, commercial driving, or working for prolonged periods. (Tr. 14, 17.) He recognized Cortez's mental limitations by limiting him to receiving job instructions at the lower end of the detail level and ruling out jobs that require collaboration with others. (Tr. 15, 17-18.)

Because the ALJ properly incorporated all of the functional limitations that he had found in his RFC assessment into the hypothetical question, and because the ALJ's RFC determination is supported by substantial evidence, the Court finds that the ALJ did not present a defective hypothetical to the VE.

The Court finds that substantial evidence supports the ALJ's ultimate determination that Cortez was not disabled during the relevant time period. An ALJ's decision is not subject to reversal, even if there is substantial evidence in the record that would have supported the opposite conclusion, so long as substantial evidence also supports the conclusion that was reached by the ALJ. *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997); *Dollins v. Astrue*, No. 4:08-CV-503-A, 2009 WL 1542466, *5 (N.D. Tex. June 2, 2009). Because substantial evidence supports the ALJ's disability determination and such determination has not been shown to be a product of legal error, remand is not required. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (stating that the court will not vacate a judgment unless the substantial rights of a party have been affected).

## RECOMMENDATION

It is recommended that the Commissioner's decision be affirmed.

## NOTICE OF RIGHT TO OBJECT TO PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within fourteen (14) days after the party has been served with a copy of this document. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file, by the date stated above, a specific written objection to a

proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

## ORDER

Under 28 U.S.C. § 636, it is hereby **ORDERED** that each party is granted until **August 19, 2011** to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation. It is further **ORDERED** that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further **ORDERED** that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

**SIGNED**
**August 5, 2011.**

JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE

JLC/rg/cak